J-S26004-22 and J-S26005-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| W.G. OBO S.A. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| P.A. | : | |
| | : | |
| Appellant | : | No. 509 MDA 2022 |

Appeal from the Order Entered February 23, 2022,
in the Court of Common Pleas of York County,
Civil Division at No(s): 2022-FC-000084-12A.

| | | |
|---|---|---|
| W.G. OBO S.A. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| D.A. | : | |
| | : | |
| Appellant | : | No. 510 MDA 2022 |

Appeal from the Order Entered February 23, 2022,
in the Court of Common Pleas of York County,
Civil Division at No(s): 2022-FC-000085-12A.

BEFORE: KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.*

MEMORANDUM BY KUNSELMAN, J.: **FILED: OCTOBER 7, 2022**

---

* Former Justice specially assigned to the Superior Court.

In these cases,[1] P.A. (Father) and D.A. (Stepmother) appeal from an order, issued by the York County Court of Common Pleas, granting a petition for Protection From Abuse (PFA) against them. *See* 23 Pa.C.S.A. §§ 6101-6122. W.G. (Mother) brought the PFA petition on behalf of her 15-year-old son, S.A. (the Child), alleging that he was beaten by Father and Stepmother. After careful review, we affirm.

The relevant factual and procedural history is as follows: On the morning of January 12, 2022, Father awoke the Child for school, but the Child did not want to go. The trial court heard various reasons why not: the Child said he felt sick; the Child wanted to skip because there was a scheduled field trip which he was not allowed to attend; the Child allegedly said he should be allowed to make his own decisions because he was 15. In any event, Father told the Child to get dressed or that he would dress the Child. At some point, Stepmother became involved in the argument between Father and the Child. Father alleged the Child used profane language toward Stepmother. N.T., 2/23/22, at 37. Father then physically removed the Child from bed and pulled a shirt over his head. Stepmother described what ensued as "a scuffle." *Id.* at 51.

The Child testified at the hearing. In the Child's telling, Father then held the Child down while Stepmother repeatedly struck him, including blows to his

---

[1] Although Father and Stepmother filed separate appeals, they present identical briefs and issues. Therefore, we address their appeals in a singular memorandum.

face causing his braces to break. At some point, Father told Stepmother to call the police. Father said police involvement was necessary "[b]ecause then can't nobody say I did anything or anybody did anything." *Id.* at 37. Father also denied that Stepmother had entered the room during the scuffle. Stepmother said she called the police, because she heard the commotion, felt that the Child was out of control, and she was afraid of what the Child might do to her son, the Child's younger stepbrother. *Id.* at 44-45. Stepmother said no one struck the Child, but that the Child incurred a brush burn from the altercation.

The police arrived and interviewed the family, together and separately. At the PFA hearing, the police officer had difficulty remembering the specifics of the incident, but the officer testified that he did not observe physical marks on the Child, only that the Child's face was red because he had been crying. After some discussion,[2] the police officer and Father told the Child that he would go to school, and Mother would pick him up. The police officer left the residence behind Father, who took the Child to school.

Although there was no formal custody order, Father had sole custody of the Child. Mother had not seen the Child in three years. Father maintained that the Child fabricated the incident because he wanted to live with Mother.

---

[2] Father testified that the Child wanted to see Mother. Father said he was amicable to his request, but that he would have to first reach an agreement with Mother. Evidently, Father acquiesced to Mother receiving the Child after school that day. *Id.* at 38.

*Id.* at 38.  Meanwhile, the Child went to the school nurse to ask for wax to put over his braces, which were cutting into his cheek.  Evidently, the school called Children and Youth Services (CYS).

Mother first learned of the incident when she received a frantic call from her daughter earlier that morning.[3]  But Mother did not realize that the Child was physically injured until she received a call from CYS.  When Mother arrived at the Child's school, she observed the Child's injuries:

> Mother:  So when he came down the hall to me and his face was bright red, he had a black and blue eye, he had a choke mark across his neck, he had a scratch across his nose[.]
>
> […]
>
> His shirt was bloody.  He had a baby blue shirt and it was bloody.

*Id.* at 9-10.

Mother filed a protection petition on behalf of the Child the next day.  After an *ex parte* hearing, the trial court issued a temporary PFA order.  Mother and the Child failed to appear for the final PFA.  Mother re-filed, and the court ultimately presided over the final PFA hearing on February 23, 2022.  The trial court issued the final, three-year PFA order, triggering the instant appeal.  Father and Stepmother present the following five issues for our review:

> 1. Did the trial court commit an abuse of discretion or error of law by allowing multiple instances of hearsay

---

[3] Mother testified that she has custody of the daughter, but that the daughter currently lives with her godmother. *Id.* at 18.  The daughter had learned of the incident from Stepmother. *Id.* at 6.

testimony over [Father's and Stepmother's] objection?

2. Did the trial court commit an abuse of discretion or error of law in discounting the testimony of a witness police officer?

3. Did the trial court commit an abuse of discretion and error of law by inserting its own opinion in lieu of expert medical testimony which was not presented, as it related to alleged injuries and bruising?

4. Did the trial court commit an abuse of discretion and error of law by making a decision that was biased by the trial court's witnessing the alleged injuries at the temporary protection from abuse hearing, which created an inherent prejudice in deciding the case?

5. Did the trial court commit an abuse of discretion or error of law by limiting defense counsel's ability to present a case and elicit testimony?

Appellants' Brief at 4-5.[4]

In their first appellate issue, Father and Stepmother claim that the trial court erred when it allowed hearsay testimony over their objection. *See* Appellants' Brief at 14. Our Rules of Evidence define "hearsay" as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay will not be admitted except as provided by the Rules of Evidence, or other rules prescribed by the Pennsylvania Supreme Court, or by statute. Pa.R.E. 802. "Hearsay within hearsay" is not excluded by the rule against hearsay if each

---

[4] Father and Stepmother filed separate but identical briefs. For clarity's sake, we refer to them as "Appellants' Brief."

part of the combined statements conforms with an exception to the rule. Pa.R.E. 805.

Critically, a statement that is not offered for its truth is not hearsay. ***See, e.g., Castellani v. Scranton Times, L.P.***, 124 A.3d 1229, 1244 (Pa. 2015). For instance, "out-of-court statements offered as evidence of what the listener heard, to prove the listener's state of mind, are not offered to prove the truth of the matter asserted, and therefore, are ***not*** hearsay." ***Castellani***, 124 A.3d at 1244-45 (citations omitted) (emphasis added).

At the hearing, the trial court asked Mother to start from the beginning. To explain how she learned of the incident, Mother relayed out-of-court statements made to her by her daughter and by CYS. Counsel for Father and Stepmother objected, but the court allowed the testimony to continue, determining that the out-of-court statements would only be considered for their effect on Mother.

| | |
|---|---|
| Mother: | […] I got a phone call at 6:30 in the morning from [our] 16-year-old daughter[.] She called me and said there was some type of – |
| Counsel: | ***Objection***. Hearsay. |
| | […] |
| Trial court: | It's going to notice – I'm going to allow it for notice in effect as to how she got a report. So, go ahead, you can continue. |
| | […] |
| | So the call comes in on Wednesday, January 12th. |

Mother:            Correct.  It came in at 6:30 in the morning.  My daughter called me frantic saying that there was some type of disturbance at the home with my son.  She was like […] [Child] is fighting with my dad, and I was like –

Counsel:            ***Object*** again.  We're now into substance.

Trial court:      She's going to have notice in effect of the abuse.  This is how the first call comes in.  This is why she swings into action.  So I'm going to allow all of it, okay? Go ahead.

N.T. at 4-6 (emphasis added).

Mother testified that the daughter said the Child was trying to fight Father because the Child did not want to go to school, and that Mother should go get the Child.  ***Id.*** at 4-6.  Mother picked the Child up from school.  This was the first time she had seen him in three years.  She explained:

Mother:            […] So it was time for school to let out, and I drove to go get him [from school] and the – on my way in route of me going to pick him up, Children & Youth called me and said that –.

Counsel:            ***Objection***.

Trial court:      I'm going to allow all of the calls, all the hearsay for notice in effect.  Go ahead.

Mother:            So in the midst of that, Children & Youth called me and said, due to injury of – as a result of what happened that morning, they are now involved, and I was again confused, like what injury? 'Cause, at this point, I didn't know anything.  I didn't know that, you know, he was put in that situation.  That's not what my daughter – you know, she obviously didn't know the details either.  So that's what we got.

> When I pulled up to [the school], my son came down the hall. Now, mind you, that this is the first time physically in three years that I've seen my son […].

Trial court: Tell me what you saw.

> [Mother then described the Child's injuries.]

N.T. at 8-9 (emphasis added).

After review, we discern no error. The trial court only accepted the out-of-court statements insofar as it related to the effect the statements had on Mother's state of mind. *See Castellani*, 124 A.3d at 1244-45. Quite clearly, Mother did not offer these statements to prove that Father abused the Child. As Mother explained, she did not understand the daughter's statement to mean that the Child was hurt, only that she might be taking custody of the Child that afternoon. Regarding Mother's testimony about the CYS call, that out-of-court statement only exemplified that Mother was surprised to learn the Child had been physically injured. Because these statements were not offered for their truth, they did not meet the definition of hearsay.

Father and Stepmother made one other hearsay objection:

Mother: Okay. Well, I – so I was – I had received a whole bunch of messages – and, again, the CYS, they have those, too – that [Stepmother] was basically saying that she doesn't want my son in her home, that she feels as though my son's gonna be a bad influence on her other children –

Counsel: I have to **object**.

> […]

Well, there's hearsay within hearsay.

> Trial court: Well, your client's here to rebut it. This is a conversation that she had directly – there are text messages she received directly from your client.

N.T. at 14 (emphasis added).

Again, we discern no error. The alleged statement was made by Stepmother, who was an opposing party. A statement made by an opposing party fits squarely into one of the enumerated exceptions to the prohibition on hearsay – namely, Pa.R.E. 803(25)(a).[5] For these reasons, the first appellate issue is without merit.

Father and Stepmother present a combined second and third issue. In their second issue, they claim the trial court erred when it "discounted" the testimony of the police officer, who testified that he did not observe bruising on the Child. In their third issue, they argue that when the court relied on its own observations of the Child's injuries, the court erroneously inserted its own opinion in lieu of expert medical testimony. We address these issues contemporaneously.

At the PFA hearing, the officer testified that he interviewed the Child and could tell that the Child was visibly upset. *See* N.T. at 30. However, the officer said he did not observe any injury:

> Counsel: Did you observe any indication of a physical altercation with the Child?

_____

[5] We disagree that the out-of-court statement constituted hearsay within hearsay. Mother alleged a singular out-of-court statement. The fact that she gave the messages to CYS is immaterial.

Officer:     I did not, no.  He was - - he did look upset like he was crying, but I honestly did not see any injuries.

Counsel:    Did not have a black eye at that time?

Officer:     No.

Counsel:    Did you notice if there were ligature marks around his neck at that time?

Officer:     No. […] I did not notice, no.

Counsel:    Did you notice any blood or scratches anywhere on the Child?

Officer:     No.

[…]

Counsel:    So, again, just to sum up, when you saw the Child that day up until he left the house, he did not have any indication of physical abuse?

Officer:     I did not see any indications, no.

Counsel:    Did he tell you in your private conversation that either his mother - - that either his Stepmother or Father had abused him in any way?

Officer:     No.

Counsel:    Did he say that they had hit him, punched him, choked him?

Officer:     No, just that they would yell at him about his chores.

N.T. at 30-32.

The trial court assigned this testimony little weight, and in its Rule 1925(a) opinion, the court explained why:

This court did not find [the officer] to be deceptive or deceitful; however, the officer's testimony was not

sufficiently credible. [The officer's] testimony was replete with self-doubt as to crucial details including but not limited to the lighting conditions in the kitchen (and whether a light was even on during the early morning hours in question) and, more importantly, whether [Father and Stepmother] could overhear his discussion with [the Child] in the kitchen. Again, [the court] did not find the officer to be purposefully misleading. Rather, this court was confronted with testimony from a witness whose initial statements about his conversation with [the Child] included the preface, "*if* I remember correctly."

Though the officer testified that [the Child] made no complaints of abuse, *he truthfully admitted that he was unable to answer whether the alleged abusers were able to overhear [the Child's] statements to him.* Similarly, [the officer] testified that he did not notice any injuries however [the officer] did not testify to having conducted an examination of [the Child].

[The officer's] testimony was not sufficiently credible because it was not reliable. Defects in his memory of the day in question are problematic *in toto*. As such, though the claim of error was not brought as a weight of the evidence claim, the clearest means of stating [the court's] position in regards to [the officer's] testimony is that because his testimony was unreliable, [the court] could not grant it much weight.

T.C.O. at 17-18 (emphasis original); *see also* N.T. at 30.

It is well settled that when we conduct appellate review, we defer to the trial court's determinations regarding the credibility of the witnesses, because the trial court, as fact-finder, observes the witnesses first-hand. *See C.H.L. v. W.D.L.*, 214 A.3d 1272, 1276-77 (Pa. Super. 2019). The weight accorded to such testimony is also within the exclusive province of the trial court, as fact-finder. *C.H.L.*, 214 A.3d at 1276. Moreover, when reviewing an order granting PFA relief, this Court must view the evidence in the light most

favorable to the petitioner, granting that party the benefit of all reasonable inferences. *Id.* at 1276-77.

Father and Stepmother say they understand these principles. Nevertheless, they maintain that error occurred when the trial court dismissed the police officer's testimony all together, in favor of its own preconceptions based on what the court observed during the *ex parte* PFA hearing. **See** Appellants' Brief at 21.

All parties and the trial court acknowledge the discrepancies in the evidence. The Child alleged that Father held him down while Stepmother beat him. But the Child did not relay that information to the police officer. The police officer said that the Child did not present any injury, but Mother claimed that she saw the injuries first-hand. No one pretends this case is without conflicting testimony and evidence. The problem is that Father and Stepmother believe that it is our role to resolve that conflict. It is not. It is "within the province of the trial court as fact-finder to resolve all issues of credibility, **resolve conflicts in evidence**, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge the parties." **Lewis v. Lewis**, 234 A.3d 706, 713-14 (Pa. Super. 2020) (emphasis added).

Clearly, the trial court resolved the conflict in favor of Mother and the Child. The court inferred that the Child's bruises did not manifest until later in the day, and that the Child did not want to tell the police officer the truth. These inferences were reasonable, especially when coupled with the fact that

the trial court did not find the police officer particularly confident in his memory of the event. Moreover, the police officer's testimony was not the only account that the court found problematic. The court did not believe Stepmother's testimony that the Child's braces were already broken before the incident.

According to Stepmother, the Child had told her that his braces were bothering him. Stepmother testified that she had meant to call the orthodontist to schedule an appointment, but it had slipped her mind. She also downplayed this fact, because the Child never mentioned the discomfort again, and the Child was scheduled for a regular appointment in a few months anyway. *See* N.T. at 49-50.

The trial court could have believed this explanation. After all, a teen's complaint about braces discomfort is practically a rite of passage. But the court did not believe Stepmother, particularly after the Child's testimony that there were no issues with his braces before the altercation with Father and Stepmother. *See id.* at 25-26. The trial court was free to make this credibility determination. Indeed, only the trial court could make such a determination. *C.H.L.*, 214 A.3d at 1276-77.

We also disagree with Father's and Stepmother's assertion – made without citation to any relevant legal authority - that the trial court could not consider its firsthand observation of the Child's bruises without expert medical testimony. Put another way, Father and Stepmother argue the court should

not have believed its own eyes. Ultimately, we discern no abuse of discretion. The second and third appellate issues are without merit.

In their fourth appellate issue, Father and Stepmother argue the trial court's decision was the result of bias and partiality, as demonstrated by the court's remarks and the fact that the court had presided over Mother's *ex parte* PFA hearing.[6]

We review challenges to a court's partiality for an abuse of discretion. *See Commonwealth v. McCauley*, 199 A.3d 947, 950 (Pa. Super. 2018) (citation omitted).

> [T]he appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as the actual presence of bias or prejudice. However, simply because a judge rules against a [party] does not establish bias on the part of the judge against that [party]. *Commonwealth v. Travaglia*, 661 A.2d 352, 367 (Pa. 1995). Along the same lines, a judge's remark made during a hearing in exasperation at a party may be characterized as intemperate, but that remark alone does not establish bias or partiality.

*McCauley*, 199 A.3d at 950-51 (further citations and quotations omitted).

In practice, "[d]iscretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that

---

[6] Father and Stepmother also consolidate their fourth and fifth appellate issues in their briefs. We address these claims separately, because each implicates a different facet of the law.

the action is a result of partiality, prejudice, bias or ill will." ***Commonwealth v. Goldman***, 70 A.3d 874, 879 (Pa. Super. 2013) (quoting ***Commonwealth v. Widmer***, 560 Pa. 308, 744 A.2d 745, 753 (2000)).

As evidence of the trial court's prejudgment, Father and Stepmother cite the trial court's description of the proceeding as a "song and dance." ***See*** Appellants' Brief at 26. The trial court began the hearing with testimony of Mother, who was the petitioning party. Because Mother represented herself, she seemed to think that the final PFA hearing was a continuation of the *ex parte* PFA hearing. She did not understand where to begin her testimony, and so the trial court directed her to re-state the allegations of abuse she had previously presented during the *ex parte* hearing:

| | |
|---|---|
| The trial court: | Okay, ma'am, go ahead and put on whatever evidence you want in support of your request for a permanent Protection From Abuse order. |
| Mother: | Okay. Other than what you have already seen - - |
| The trial court: | Well, we'll go over it again since it's a full hearing, but I do remember you, so just – let's go through the whole song and dance. |
| Mother: | Okay. Where do you want me to start? |
| The trial court: | Well, start with the most recent allegation – the most recent --- |
| Mother: | As far as the abuse? Okay. […]. |

***See*** N.T. at 4-5.

After review, we do not share the Appellants' concern with this exchange. We appreciate that litigants might have a low tolerance for idioms when courts are poised to pass judgment on them and their families. But the court's use of a colloquial expression in this instance is not demonstrative of its bias, partiality, or the appearance of the same. Besides, even an intemperate remark made in exasperation does not necessarily establish a court's bias. *See McCauley*, 199 A.3d at 51; *see also Interest of D.J.B.*, 230 A.3d 379, 386 (Pa. Super. 2020) (holding that a judge's remark contextualizing the juvenile's delinquent act within the Me Too Movement did not establish bias or partiality). Frankly, this dialogue exhibits the opposite. Although the trial court and the parties were familiar with the allegations, the court understood that Mother must start over from the beginning. The court recognized that, in a final PFA hearing, Mother must develop the record in the crucible of an evidentiary hearing, which affords the respondents an opportunity to be heard.

But Appellants' bias argument does not end here. They also allege that the trial court had an inherent bias, because it presided over the previous, *ex parte* hearing. Father and Stepmother contend that it was "clear from the outset of the hearing" that the trial court's conclusions were "pre-drawn." *See* Appellants' Brief at 25. If the court's bias was self-evident from the beginning, then Father and Stepmother should have sought recusal before the trial court. Their failure to do results in waiver, pursuant to Pa.R.A.P. 302(a) ("Issues not

raised in the lower court are waived and cannot be raised for the first time on appeal."). ***See Lewis v. Lewis***, 234 A.3d 706, 721 (Pa. Super. 2020).

In ***Lewis***, the trial court determined that the parties' marriage settlement agreement was invalid because the wife signed it under duress. On appeal, the appellant-husband alleged that the court's decision was the result of the trial judge's implicit bias, because the judge had granted the wife's petition for Protection From Abuse the previous year. The problem was that the husband did not seek the court's recusal prior to, or even during, the second trial. ***Lewis***, 234 A.3d at 721.

We explained that trial judges often preside over multiple hearings involving the same family, whether it is because the local court of common pleas employs a family division with a "one judge, one family" policy, or because that county's court of common pleas only employs a few trial judges. We have never suggested that such judges should automatically recuse when confronted with their prior determinations. ***Id.*** at n.5. "[O]ur trial judges are honorable, fair and competent" and they are "best qualified to gauge [their] ability to preside impartially." ***Id.*** (citing ***In re A.D.***, 93 A.3d 888, 893 (Pa. Super. 2014)).

In summation of this fourth appellate issue, we conclude that the trial court's remarks did not demonstrate its bias, partiality, or the appearance thereof. Insofar as Father and Stepmother claim the trial court had a *per se* bias, stemming from its adjudication of the *ex parte* PFA hearing, we conclude such a challenge is waived.

In their final appellate issue, Father and Stepmother claim the trial court erred when it terminated their line of questioning during the cross-examination of Mother. They argue the court erred for two reasons. First, they once again allege bias. Father and Stepmother cite the judge's remarks – different remarks – made at that time of its evidentiary ruling. Second, they argue that the court's termination of the cross-examination constituted an evidentiary error. We address each reason in turn.

Counsel for Father and Stepmother had pressed Mother about the Child's behavioral issues and whether he has mental health diagnoses. *See* N.T. at 19-20. The cross-examination then addressed whether the Child attended traditional school or alternative school due to his issues.

The court interjected:

> Let me interrupt, counsel. I saw this boy at the *ex parte* hearing. He was beaten up. So I don't care what his mental health diagnoses were, I don't care what schools he went to, I don't care whether [Mother] feels his diagnoses are serious or not serious, I don't care. This boy was beaten up. I saw him beaten up in my courtroom, and I read the assault and the battery into the record because it was visible from this distance.
>
> So if you have cross-examination that's relevant to that that's going to exonerate your clients, then God bless, I want to hear it, but otherwise, I saw that boy and he still has a bruised eye visible to me at eight yards.

N.T. at 20-21.

On appeal, Father and Stepmother argue that the court's reference to the *ex parte* hearing, and the prior findings, demonstrate the court's antipathy toward any information that might differ from its preconceptions.

We disagree. The trial court merely explained that it noticed the Child's injuries at the *ex parte* hearing, and that the injuries to the Child were still present at the final PFA hearing. Nevertheless, the court was open to alternative explanations of how the Child received these injuries, e.g., whether the Child got into a fight at school or whether they were the result of self-harm. *See id.* at 27; *see also* T.C.O. at 26. The court merely wanted the parties to get to the point, especially if their argument was that the Child incurred injuries after having to be restrained. Father and Stepmother did not make that argument, however. They maintained that the Child was never injured. The court considered that explanation as well. The court heard testimony from the responding police officer about what he observed and what the Child said. Indeed, the court even entertained testimony that the Child's face was not actually bruised at all, but that the Child simply gets dark circles or bags under his eyes when he stays up too late. *See* N.T. at 48.

The trial court ultimately did not credit these alternative theories. Still, just because a court rules against a party does mean that the court is biased. *See McCauley*, 199 A.3d at 950-51. The court simply did not find the Child's education history to be indicative of whether or how the Child was injured. Thus, we do not find merit in their primary argument that the trial court erroneously terminated cross-examination due to its own bias.

- 19 -

We turn next to their secondary argument – *i.e.*, that when the court terminated cross-examination, the court improperly excluded relevant testimony thereby committing an evidentiary error. We are guided by the following principles. The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. ***Commonwealth v. Antidormi***, 84 A.3d 736, 749 (Pa. Super. 2014).

The threshold inquiry with admission of evidence is whether the evidence is relevant. ***Id.*** at 750 (citation omitted).

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact.

***Id.***; ***see also*** Pa.R.E. 401; 402; 403.

Father and Stepmother claim "[c]ounsel was hamstrung." ***See*** Appellants' Brief at 27. But at the hearing, counsel did not object. Nor did counsel seek the court's indulgence in order to lay a foundation. Only on appeal does counsel explain that the line of questioning about the Child's mental health and educational history was designed to impeach Mother's credibility. But these arguments had to be made to the trial court in the first instance. ***See*** Pa.R.A.P. 302(a), ***supra***.

Impeachment aside, Father and Stepmother present still another reason why the testimony was relevant. They maintain that Mother's prior custody

involvement and the Child's mental health and educational history were relevant, because the trial court's PFA decision "was ultimately a custody decision." **See** Appellants' Brief at 28. They conclude that they should have been "afforded the broadest scope and latitude in presenting a case and defense, in order to put the trial court in the best possible position to make a decision in the best interest of the child." **Id.**

This is incorrect. Although a PFA petition brought on behalf of a child against a parent has custody implications, the PFA issue and the custody issue are separate inquiries. We explained this dichotomy in **C.H.L.**, **supra**. There, the question was whether the trial court could grant PFA petition brought on behalf of a child, without considering the child's "best interests," as defined in the Child Custody Act. **See** 23 Pa.C.S.A. § 5328(a).

We explained that, insofar as a final PFA order affected the parties' custody rights, the PFA order was essentially a temporary custody order, no different than an interim custody order issued pursuant to Pa.R.C.P. 1915.13 ("Special Relief") or 1915.4(e) ("Emergency or Special Relief"). **C.H.L.**, 214 A.3d at 1283. We concluded that Section 5328(a)'s mandated consideration of the Child's best interests only applies to final custody awards, not temporary solutions to emergencies. **Id.** As interim or emergency custody orders may be issued without a Section 5328(a) analysis, so too may a court issue a final PFA order.

Cognizant that "dishonest parents might utilize a protection order as vehicle to bypass the Child Custody Act," we explained that the Domestic

Relations Code accounts for this potential exploitation by allowing PFA defendants to petition for custody modification, notwithstanding the existence of a PFA order. *Id.* at 1284.

Here, the learned trial court was aware of the effect that its PFA order would have on Father's custody rights. This is why the court directed the parties to custody court, should Father seek to exercise those rights. *See* N.T. at 55. Therefore, because the trial court was not obligated to consider the best interests of the Child, the court did not err when it excluded testimony that could have been relevant in a best interests analysis.[7]

In sum, we conclude the trial court did not err when it admitted out-of-court statements; the court did not err when it afforded little weight to the testimony of the police officer; the court did not err when it determined that Child was injured, notwithstanding the absence of expert medical testimony; the court did not demonstrate bias, partiality, or the appearance thereof; and the court did not err for terminating a desired line of cross-examination. To the extent that Father and Stepmother allege the court was inherently biased,

---

[7] We note Father and Stepmother rely on *Lawrence v. Bordner*, 907 A.2d 1109, 1114 (Pa. Super. 2006) and *Shandra v. Williams*, 819 A.2d 87 (Pa. Super. 2003). In *C.H.L.*, we concluded that the *Shandra* decision was predicated on the prior iteration of the Child Custody Act and thus abrogated by statute. *See C.H.L.*, 214 A.3d at 1280-81.

Regarding *Lawrence*, Father and Stepmother only rely on that portion of *Lawrence* which quotes *Shandra*. *See* Appellants' Brief at 31-32; *see also* Lawrence, 907 A.2d at 1114 (quoting *Shandra*, 819 A.2d at 92). As such, neither of these cited authorities are controlling in this matter.

having previously adjudicated the *ex parte* hearing, the parties waived this claim for failing to seek the trial court's recusal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/07/2022